## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

MARVA L. HURST,                          )
            **Plaintiff,**                )
                       )
v.                                       )          NO.  3:05-CV-1826-B (ECF)
                       )
COMMISSIONER OF THE                      )
SOCIAL SECURITY ADMINISTRATION,  )
            **Defendant.**               )

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

The District Court referred this case to the United States Magistrate Judge for findings, conclusions, and recommendation pursuant to 28 U.S.C. § 636(b).  Marva L. Hurst ("Plaintiff") appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner"), denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act") and Supplemental Security Income benefits ("SSI") under Title XVI of the Act.  The United States District Court for the Northern District of Texas, Dallas Division, has jurisdiction, and venue is proper here.

The Court considered "Plaintiff's Appeal," filed January 5, 2006, "Defendant's Brief," filed February 1, 2006, and "Plaintiff's Reply Brief," filed February 16, 2006.  The Court has reviewed the parties' evidence in connection with the pleadings.  For the reasons that follow, the final decision of the Commissioner should be affirmed.

# I.

Plaintiff filed DIB and SSI applications on April 30, 2002, alleging an onset of disability on September 18, 2000, due to back pain, morbid obesity, and depression.  (Tr.[1] 107-09, 116, 313-16, 329.)  Plaintiff's claim was denied initially and on reconsideration.  (Tr. 66-74, 80-83, 317-328.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 23-65.)  The ALJ held a hearing on April 15, 2004, and rendered a decision that Plaintiff was not disabled on December 23, 2004.  (Tr. 15-22.)  *See* 20 C.F.R. §§ 404.1520, 416.920.  The ALJ found that Plaintiff had severe impairments consisting of back pain and morbid obesity, but that she did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 19, 21, Findings 3 and 4.)  The ALJ determined that Plaintiff's subjective complaints were exaggerated and not entirely credible.  (Tr. 20.)  The ALJ found that Plaintiff retained the RFC to lift/carry and push/pull 40 pounds occasionally and 20 pounds frequently; stand for 30 minutes at a time for a total of four hours in an eight-hour workday; walk 15 minutes at a time for a total of two hours in an eight-hour workday; sit for one hour at a time for a total of six hours in an eight-hour workday; occasionally stoop, bend, and climb stairs; but that she could not crawl. (Tr. 21-22, Findings 5 and 6.)  After the ALJ considered the testimony of a vocational expert ("VE"), he concluded that Plaintiff was capable of performing her past relevant work ("PRW") as an administrative assistant, as that job is usually performed.  (Tr. 21-22, Findings 6, 7, and 8.)  The Appeals Council denied Plaintiff's request for review on July 14, 2005, making the ALJ's decision the Commissioner's final decision ("the Decision").  (Tr. 5-8.)  *See* 42 U.S.C.

---

[1] The references are to the transcript of the administrative proceedings, which is designated as "Tr."

§ 405(g).  Plaintiff contends that the Commissioner's denial of DIB and SSI is not supported by

substantial evidence.  In support of this allegation Plaintiff argues that: (1) the Commissioner did

not  fully consider all of the Plaintiff's nonexertional impairments; (2) the Commissioner did not

give proper weight to the opinions of Plaintiff's treating physicians; and (3) the Commissioner did

not properly evaluate Plaintiff's credibility.  (Pl.'s Br. at 1.)  The Commissioner responds that the

Decision is supported by substantial evidence and requests that her final decision be affirmed.

(Def.'s Br. at 3.)

## II.

Plaintiff met the disability insured status requirements at all relevant times.  (Tr. 16.)

Plaintiff was born on June 28, 1954 and alleges that she first became disabled on September 18,

2000.  (Tr. 107.)  Plaintiff earned a GED.  (*Id*.)  Plaintiff is single, and she has a thirty-year old son.

(Tr. 27.)  Plaintiff's past work experience includes employment as a bus driver, administrative

assistant, temporary service recruiter, baker, and repair person (compressor building).  (Tr. 16.)

## III

On September 18, 2000, Plaintiff fell off the bumper of a bus, landing on her back.  (Tr. 154.)

She was treated at the emergency room at Presbyterian Hospital.  (*Id*.)  X-rays of the thoracic

spine revealed mild to moderate degenerative changes.  (Tr. 156.)  On September 22, 2000, Plaintiff

consulted P. Yeh, D.C., a chiropractor.  (Tr. 160-62.)  Dr. Yeh found that forward flexion of the

cervical spine was limited to 45 degrees with additional restriction noted in other ranges of motion.

Dr. Yeh's examination of the lumbosacral spine also found limited range of motion, with extension,

left lateral rotation and right lateral rotation restricted to 15 degrees each.  He noted two+ pain and

spasms in the cervical, thoracic and lumbosacral spines and straight leg raising was restricted to 30

degrees bilaterally.  (Tr. 161.)  Dr. Yeh diagnosed a cervical/dorsal sprain, thoracic sprain and lumbar sprain. (Tr. 162.)  He recommended physical therapy and rehabilitation, strengthening and stretching exercises and an MRI.  (*Id*.)

Robert Cassella, M.D., examined Plaintiff on September 22, 2000.  (Tr. 160-62.)  He diagnosed Cervical/dorsal sprain, Toracic sprain, and Lumbar sprain.  Her prognosis was good. Cervical and lumbar MRI studies were performed on October 6, 2000. (Tr. 248-49).  Dr. Cassella examined Plaintiff again on October 6, 2000, after the MRI.  He noted that Plaintiff complained of pain, stiffness and discomfort in her neck and mid/lower back, with radiation of neck pain into shoulders.  She also complained of headaches and poor sleep.  She was treated with physical therapy, Tylox for pain, and Midrin for headaches.  She was also given Xanax.  The MRI of the cervical spine was interpreted as demonstrating 2 to 3 mm posterior central disc protrusion or herniation at C3-4.  The MRI of the lumbar spine found a 1-2 mm posterior central disc protrusion or herniation at L5-S1.  (Tr. 158.)  Dr. Cassella diagnosed cervical disc protrusion/herniation with cervical/dorsal sprain, thoracic sprain, lumbar sprain and post-traumatic headaches.  He recommended exercises and indicated that Plaintiff may need steroid injections, and orthopedic or neurological consultations, if her symptoms persist or become worse. (Tr. 159.)  Dr. Yeh and Dr. Cassella continued to care for Plaintiff.  (Tr. 194-252, 297-312.)  Plaintiff complained of pain in the neck, mid-back and lower back, headaches, and a decreased ability to sit for prolonged periods.  (Tr. 245, 247.)  Examination found trigger point tenderness in the upper trapezius, paraspinal and gluteal muscles.  (Tr. 244-45.)  Plaintiff complained of pain at level 8-9 on a scale of 0 to 10.  (Tr. 242.)

At a pain clinic on January 9, 2001, Plaintiff was evaluated by Dr. Paul Tucker.  (Tr. 236.) Dr. Tucker determined that range of motion caused +2 pain over the left side and straight leg raising

caused +3 pain in Plaintiff's left lower extremity.  Plaintiff was unable to squat due to severe low

back pain.  Dr. Tucker diagnosed a herniated nucleus pulposus at L5-S1 and at C3-C4 and

recommended continuation of her current treatment.  (Tr. 236.)

Dr. Cassella continued Plaintiff's medications, including Valium, Dilaudid, Dyazide, Midrin,

Xanax, Nubain, Vicodin and Ultram.  (Tr. 213-17, 219-224, 226-28, 231, 233-35.)  Dr. Tucker

administered lumbar epidural steroid injections on January 9, 2001, January 23, 2001, and February

9, 2001.  He administered cervical epidural steroid injections on April 13, 2001.  (Tr. 268, 277, 279-

280, 283-84.)  Dr. Tucker diagnosed a herniated nucleus pulposus at L5-S1 and at C3-C4.  (Tr. 282,

267.)

Plaintiff reported that she had experienced no pain relief from her injection.  (Tr. 232, 225.)

Dr. Cassella recommended a referral to Dr. John Peloza. (Tr. 223.)  Dr. Peloza evaluated Plaintiff

on June 15, 2001. (Tr. 169-171.)  Plaintiff advised that she experienced pain at a level 8 to 8½ out

of 10.  The pain was described as constant, aching and progressive, refractory to conservative care.

Her pain was aggravated with sitting, standing, bending, lifting and twisting and had not responded

to epidural steroid injections, physical therapy, exercises and medication.  (Tr. 169.)  Dr. Peloza

found that Plaintiff was 5 feet 3 inches tall and weighed 290 pounds.  She had decreased sensation

of the left lateral leg and point tenderness at the L2-3 and L3-4 levels.  Pain was reproduced on

palpation of the lumbar spine.  Dr. Peloza reviewed the pre-existing MRI but felt that it was of

exceedingly poor quality and recommended a repeat MRI, sacroiliac joint blocks, and possible

discography.  He diagnosed mechanical low back pain.  (Tr. 170.)  Plaintiff returned to Dr. Peloza

on July 11, 2001, complaining of severe pain in the lumbosacral region and traveling down both

thighs despite using Dilaudid and Valium to control her pain.  (Tr. 168.)   Sacroiliac blocks were

administered but did not provide any relief.  (Tr. 167.)  On August 30, 2001, Dr. Peloza's office issued a "letter of medical necessity," for the purpose of showing that lumbar discography was medically necessary.  The letter indicated that Plaintiff had been diagnosed with low back pain and early degeneration and that her symptoms included pain in both legs, numbness of the toes and tingling in both lower extremities.  Her pain was described as chronic and debilitating, with severe symptoms in her lower back and lower extremity radiculopathy.  (Tr. 165.)

Dr. Stanley Hite evaluated Plaintiff on March 19, 2002, at the request of the Texas Workers' Compensation Commission.  (Tr. 172-76.)  Plaintiff complained of constant low back pain.  The pain in her right lateral thigh extended beyond the knee to mid-calf level.  The left leg pain was intermittent and she complained of generalized lumbar pain, greater on the left.  She also reported swelling of both legs, occurring since October 2000.  Plaintiff reported numbness and tingling in the right lateral thigh and the upper aspect of the right lower leg, occurring intermittently.  She said that her back pain increased with sitting or standing for more than a few minutes and that walking caused her pain after about 10 minutes.  (*Id.*)

Plaintiff reported that her pain was relieved somewhat by lying on her left side and by using pain medications.  (Tr. 174.)  She said that when they wore off, her pain increased.  (*Id.*)  Dr. Hite noted that Plaintiff is obese.  He reported that she cried during the examination on several occasions and exhibited pain behavior by heavy breathing and occasional blowing of air from her mouth.  Dr. Hite noted tenderness in the lumbar midline and left lumbar paraspinal muscles, as well as bilateral sacroiliac and right posterior thigh tenderness.  He found 1+ pitting edema of the left lower leg. Plaintiff ambulated with the help of a cane.  (Tr. 175.)  Flexion and extension of the lumbosacral spine were grossly diminished.  Reduction was also seen in lateral flexion and rotation. Plaintiff

complained of severe pain upon attempting heel and toe walking.  Hip flexion caused severe lumbar pain.  There was decreased light touch sensation in the entire right lower extremity, including the foot.  Knee jerks were "flicker" bilaterally and ankle jerks were "flicker" to absent bilaterally.  Dr. Hite found no ratable neurological impairments, deeming the sensory changes too extensive and not in a dermatome pattern.  He thought she had good motor function and found no specific disorders.  Dr. Hite found that Plaintiff had reached maximum medical improvement as of the date of his examination and rated her as a 0% impairment of the whole person for worker's compensation purposes.  (Tr. 176.)

John M. Harney, a Board-certified neurologist, reviewed the records.  (Tr. 181-183.)  Dr. Harney found no medical necessity for Plaintiff's medications.  He stated her neurological examination was normal, and two MRI's unremarkable.  He found no objective evidence on musculoskeletal or clinical exam, or any type of other objective tests to suggest a reasonable pain generator.  He noted that multiple physicians had indicated no significant findings and no significant trigger points, or myofascial dysfunction.   Dr. Harney concluded that there was evidence of functional overlay, that Plaintiff is morbidly obese, and that she was noted to be depressed.  (Tr. 183.)

Dr. Robert A. Harris conducted a consultative examination on January 28, 2003.  (Tr. 253-255.)  Dr. Harris noted that Plaintiff was a well developed, nourished individual who was cooperative, well groomed, and in no acute distress.  (Tr. 254.)  Her sensory exam was normal.  (*Id.*)  Her deep tendon reflexes were 2 + in both upper and lower extremities, and her motor strength was good.  (*Id.*)  Plaintiff's  medications included Nexium, Oxycontin, Triamterene, and Xanax.  (Tr. 253.)  Dr. Harris observed that Plaintiff was 5 feet 2 inches tall and weighed 274 pounds, with a

body mass index (BMI) of 50.  Straight leg raising was positive on the left at about 30 degrees.  Her low back was mildly tender to palpation, and she was unable to bend and squat without difficulty. Dr. Harris diagnosed lumbar radiculopathy with chronic low back pain and obesity.  He advised that Plaintiff had chronic low back pain, was on chronic narcotics, and was never pain free for more than a few minutes.  He indicated that she was not able to do substantial physical activity.  (Tr. 254.)

A Physician's Statement prepared by Dr. Cassella for purposes of Plaintiff's welfare application indicated that Plaintiff suffered from discogenic disease of the lumbar spine and that her condition was severe enough to keep her from performing even light duty or sedentary work.  The disability duration was noted to be indefinite.  (Tr. 312.)  Treatment notes of Dr. Cassella indicated that Plaintiff was found to have intractable low back pain.  (Tr. 308-12.)  Dr. Cassella repeated his opinion that Plaintiff was disabled indefinitely for a worker's compensation injury report on January 9, 2003, indicating that she suffered from L5-S1 radiculopathy.  (Tr. 306.)  He continued to treat Plaintiff with Dilaudid, Ultram and Talwin for intractable low back pain (Tr. 297-307) and continued to prescribe Valium and Midrin.  (Tr. 297-99.)

## IV.

Plaintiff testified that she stopped working in September 2000 when she fell off the bumper of a bus and landed on her back, buttocks, and neck.  (Tr. 31-32.)  She said she was treated by Dr. Cassella and referred to Dr. Peloza.  Dr. Peloza recommended a discogram but the insurance company declined to pay for one.  As a result, Dr. Peloza returned Plaintiff to her primary physician, Dr. Cassella.  (Tr. 33-34.)  Dr. Cassella treated her with Dilaudid, Midrin, Valium and Xanax and also gave her Dyazide for leg swelling.  (Tr. 34.)

Plaintiff complained that she had constant low back pain which was aggravated by sitting,

walking, bending, lifting or stooping.  Her pain was better with rest and when she elevated her legs, when she used ice and when she alternated between sitting and standing.  She used Dilaudid three times per day but this medication made her feel drowsy for a couple of hours every time she took it.  She also testified that she had pain extending down both legs.  She claimed the pain was greater on the left side than on the right.  She also complained of numbness and tingling that extended into her toes.  She said that this affected her walking and caused her to drag her left foot.  (Tr. 35-37.) Plaintiff further reported that she had to urinate frequently, and that she could not delay the urge to urinate.  She testified that she had made three trips to the bathroom in the two hours before the hearing.  (Tr. 37-38.)  Plaintiff attributed her frequent urination to her use of Dyazide.  She maintained that she had to urinate more than once an hour for the first three hours after she took the medication.  (Tr. 40-41.)  Plaintiff also stated that she had migraine headaches two to three times per week.  She stated the headaches were eased with Midrin in one hour but that during this hour she had to lie down and put ice on her head.  (Tr. 38-39.)  She also took Valium twice a week. (Tr. 39.)  Plaintiff further testified that she had constant swelling of the legs which required her to lie down and elevates her legs above her head three to four times per day, for twenty to thirty minutes at a time.  (Tr. 40-41).  She claimed she had been using a cane for a couple of years due to unsteadiness and held onto walls and furniture when she walked inside her home.  (Tr. 41.)

Plaintiff testified that she could sit only ten minutes and acknowledged that she had stood five times in the first twenty minutes of the hearing because of her need to change positions.  (Tr. 42.)  She said she could walk only five minutes and stand only five minutes because of the pain in her back and legs.  (*Id*.)  She said she had trouble lifting a gallon of milk because it pulled on her back. (Tr. 43.)

Plaintiff further asserted that her sleep was limited because of pain. Her friend did her housework.  Therefore, Plaintiff did very little housework and cooked only TV dinners.  She did some grocery shopping but did not unload the groceries.  (Tr. 44-45.)   She could not bend over to tie her shoes and had to sit on the bed to pull up her slacks.  (Tr. 46.)  She was unable to take a shower until after she had taken her medicine.  (Tr. 46-47.)  She stated that her average level of pain was 8 to 9 on a scale of 0 to 10 and that Dilaudid reduced the pain to a level 5 for three to five hours. (Tr. 47.)

Dr. Susan Blue testified as a medical expert ("ME").  Dr. Blue noted that the claimant had a history of hypertension, reflux esophagitis and chest pain. There was a remote history of carpal tunnel surgery on both hands. She had low back pain beginning with her fall in September 2000, with radiation down the lower extremities, greater on the left than the right.  Straight leg raising had been positive and lower extremity numbness had been observed.   Some of the examinations, including one of January 28, 2003, indicated that the reflexes were symmetric, and that sensory and motor examinations were good.  Lumbar spine films of January 28, 2003 were normal.  Dr. Blue concluded that Plaintiff had degenerative lumbar disc disease with some radicular symptoms, but that it did not meet or equal a listing.  (Tr. 49.)

The ALJ asked Dr. Blue her opinion about Plaintiff's capacity to perform work-related functions.  Dr. Blue indicated that Plaintiff could sit a total of six hours in an eight-hour work day; stand a total of four hours in an eight-hour work day; and walk two hours in an eight-hour work day. She could lift twenty pounds frequently and forty pounds occasionally.  Bending, stooping, and climbing stairs were restricted to an occasional basis, and crawling was prohibited. (Tr. 49-50.)

Dr. Blue acknowledged that Dilaudid was usually prescribed for severe pain and that it could

cause dizziness and drowsiness.  Dr. Blue indicated that Dilaudid is not appropriately prescribed over long periods of time, such as years.  Some patients may continue to feel side-effects of Dilaudid, even when they should be acclimated to it.  The drowsiness can be to such degree as to interfere with attention and concentration.  (Tr. 50-51.)  Dyazide is a diuretic that could increase frequency of urination.  (*Id.*)  Dr. Blue noted that Plaintiff is obese and that her obesity can magnify problems with degenerative disc disease.  (Tr. 52.)  Further, Dr. Blue found evidence of edema which could be controlled by elevation of the legs.  (Tr. 53.)   The doctor noted that a nerve conduction velocity study performed June 24, 2002, showed abnormal findings. (Tr. 54.)  The nerve conduction study found "L5-S1 radiculopathy on the left side as indicated by the H-reflex study. Abnormally delayed F-wave latencies on the left side indicate an ongoing irritation of the lumbar nerve roots on the left side.  Dysfunction of the peripheral sensory nerves in the left lower extremity confirm patient's reported symptoms as valid and anatomically sound." (Tr. 197.)  Dr. Blue further testified that steroid injections are generally prescribed for radicular pain and Valium is usually prescribed for anxiety.  Depression could affect an individual's perception of symptoms and could heighten the perception of pain.  (Tr. 63.)

The VE indicated that Plaintiff's past work ranged from sedentary to medium in exertion and from semi-skilled to skilled. A hypothetical question based upon the functional capacity estimate of the medical expert witness yielded a response that Plaintiff could return to her past work as an administrative assistant.  (Tr. 56-57.)  However, the vocational expert acknowledged that frequent urination might be a problem in maintaining employment, depending upon the employer.  (Tr. 58-59.) The VE also said that if, due to drowsiness, Plaintiff's concentration, persistence and pace were moderately impaired, she would be unable to maintain work.  (Tr. 59-60.)  If pain caused moderate

interference with concentration, persistence and pace throughout the day, this could preclude performance of the job of administrative assistant. (Tr. 61.)  If an individual had to lie down three to four times per day to elevate the legs for twenty to thirty minutes at a time, such individual could not maintain employment. (Tr. 62.)  Further, if an individual had to stand thirteen times during the course of a sixty-five minute hearing, that could indicate problems that could adversely affect performance of the job of administrative assistant. (Tr. 64.)

The ALJ found that Plaintiff's vocationally significant impairments were back pain and obesity. (Tr. 21.)  He maintained that while there was an allegation of depression, the record reflects no actual treatment for this impairment. (Tr. 19.)  He further noted that Dr. Cassella deemed Plaintiff to be disabled but felt that the doctor might be referring solely to an inability to perform her past work as she performed it, rather than a conclusion that she could not perform any work. (Tr. 20.)  The ALJ found that Plaintiff retained the functional capacity indicated by Dr. Blue in her testimony. (Tr. 20).  The ALJ found that based upon such capacity, Plaintiff could return to her past relevant work as an administrative assistant, as it is generally performed. (Tr. 21.)

## V.

A claimant must prove that she is disabled for purposes of the Social Security Act to be entitled to social security benefits.  *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference.  *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized.

13

*Greenspan*, 38 F.3d at 236; 42 U.S.C.A. § 405(g).  Substantial evidence is defined as "that which

is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must

be more than a scintilla, but it need not be a preponderance."  *Leggett*, 67 F.3d at 564.  The

reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but

rather scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38

F.3d at 236.

## VI.

In support of Plaintiff's claim that the ALJ's decision is not supported by substantial

evidence, she argues that the ALJ failed to consider all of Plaintiff's non-exertional impairments.

Plaintiff admits that the ALJ recognized obesity as one of the Plaintiff's severe impairments.  (Tr.

21, Finding No. 3.)  This finding indicates that obesity caused limitations or restrictions having more

than a minimal effect upon Plaintiff's ability to perform work-related activities.  Plaintiff argues,

however, that the ALJ never evaluated the impact of Plaintiff's obesity upon her ability to engage

in work-related functions.  The Court finds that the ALJ thoroughly discussed the medical evidence

in the record applying the correct legal standards.  In assessing the effects of Plaintiff's severe

impairments, back pain and obesity, the ALJ did not mention Plaintiff's obesity by name.

Nevertheless the ALJ acknowledged that Plaintiff's impairments, which necessarily included her

obesity, imposed functional limitations. (Tr. 19-20.) He concluded based upon Plaintiff's activities

such as watching television, crocheting, driving, and grocery shopping that Plaintiff's subjective

complaints were exaggerated and not entirely credible to the extent contended.  (Tr. 20.)  The ALJ

then considered the ME's assessment of Plaintiff's RFC, Dr. Cassella's medical opinion that

Plaintiff was "disabled," and the record in its entirety before reaching his own assessment of

Plaintiff's RFC and deciding whether Plaintiff could perform any of her past relevant work.  There is no indication that the ALJ failed to do his job and simply deferred to the ME as Plaintiff argues. The Court finds that Plaintiff has not shown that the ALJ failed to properly consider her obesity.

Plaintiff contends that the ALJ failed to consider the impact of Plaintiff's anxiety and depression upon her ability to perform and sustain work-related functions.  A lack of medical evidence in the record indicating that a claimant was diagnosis with and treated for depression can discredit her claim.  *See Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003)(noting that the plaintiff had not sought, nor been referred for, professional mental health treatment); *Fraga v. Bowen*, 810 F.2d 1296, 1303 (5th Cir. 1987) (noting the frequency of the plaintiff's treatment in evaluating the severity of the alleged pain).  Plaintiff did not point to any medical evidence that indicated limitations that Plaintiff suffers on account of anxiety and depression.  Additionally, Plaintiff did not present any objective evidence consisting of medical diagnosis or testing results to substantiate these claims.

Plaintiff testified that she took Valium for "stress" twice a week (Tr. 39).  The ME acknowledged that the record shows that Plaintiff has been prescribed Valium and that, in general, it is used for anxiety.  (Tr. 63, 66.) The ME testified that she does not know why Valium was prescribed  for Plaintiff, but noted that Valium would not be prescribed for depression because it could actually aggravate depression.  (Tr. 66.)  Plaintiff reported to Dr. Hite that she was taking Xanax only at night as needed to help her sleep.  (Tr. 175.)  The only mention in the medical records by Plaintiff's physicians of symptoms of anxiety or depression is a notation apparently made by Dr. Peloza, who is not a mental health professional.  Dr. Peloza treated Plaintiff for back and neck pain and simply noted that Plaintiff was "mentally depressed."  (Tr. 182.)  The ALJ considered this

notation. (Tr. 18). The ALJ correctly noted that Plaintiff alleged depression, but properly stated that she sought "no actual treatment for this alleged impairment." (Tr. 19). In fact, Plaintiff's treating physician, Dr. Cassella, indicated that Plaintiff had no mental limitations. (Tr. 312.) The ALJ did not err by failing to consider the effect of Plaintiff's depression.

Plaintiff urges that the ALJ failed to consider whether the frequency of her need to alternate positions would adversely affect her ability to adequately perform the job of administrative assistant. Additionally, Plaintiff argues that the ALJ did not consider her need to elevate her legs, and her need for frequent bathroom breaks. However, as the Commissioner correctly points out, the ALJ did give consideration to Plaintiff's allegations as to sitting and standing since he concluded she has the RFC to sit for one hour at a time for up to six hours, stand for 30 minutes at a time for up to four hours, and walk for 15 minutes at a time for up to two hours (Tr. 20). The ALJ did not find fully credible Plaintiff's testimony that she can only walk for five minutes, stand for five minutes, sit for ten minutes, and that she must elevate her legs frequently. (Tr. 19-20.) The ALJ provided the limitations that he found to be consistent with the rest of the record. (Tr. 20, 42.) With respect to Plaintiff's claim that she must frequently go to the bathroom, the record established that Dr. Cassella prescribed Dyazide, a diuretic. The ME acknowledged that Dyazide can increase urination. (Tr. 51). The VE testified that Plaintiff's need to urinate at the frequency which she described would be "a problem" for employers. (Tr. 59.) Plaintiff did not present any medical evidence of her "urgency and frequency" problem and the impact it had upon her. The ALJ found that Plaintiff's subjective complaints were exaggerated, and thus the ALJ properly did not include any bathroom break restrictions in her RFC. (Tr. 20.) *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988)(finding that the hypothetical must include only those limitations the ALJ finds supported by the record).

Upon determining Plaintiff's RFC, the ALJ appropriately considered the VE's testimony in assessing Plaintiff's ability to return to her PRW at step four. (Tr. 21.) *See Leggett*, 67 F.3d at 564-65. The ALJ determined, based on the VE's testimony, that Plaintiff's PRW as an administrative assistant as normally performed in the economy was sedentary, skilled work. (Tr. 21, 56). The ALJ presented a hypothetical question to the VE containing the same limitations set out in his determination of Plaintiff's RFC. (Tr. 57.) The VE testified that, despite Plaintiff's testimony of heavy lifting involved with her job, a person with the RFC given by the ALJ could perform Plaintiff's PRW as an administrative assistant as it is generally performed in the national economy. (Tr. 21, 30, 56-57.) The Commissioner may find a claimant capable of performing her PRW if she is capable of performing her past work as it is generally performed in the national economy, even though she cannot perform certain requirements of specific past jobs. *See Leggett*, 67 F.3d at 564-65. Accordingly, the VE's testimony provides substantial support for the ALJ's determination that Plaintiff was capable of performing her PRW. (Tr. 21, 56-57.)

Plaintiff contends that the ALJ failed to give proper weight to the opinions of Plaintiff's treating physicians and improperly relied upon the testimony of a non-examining ME in assessing Plaintiff's residual functional capacity ("RFC"). (Pl.'s Br. at 17-20.) The ALJ determined that Plaintiff had the RFC "lift/carry 40 pounds occasionally, and 20 pounds frequently; push/pull 40 pounds occasionally. and 20 pounds frequently; stand for ½ hour at a time for a total of 4 hours in an 8-hour workday; walk 15 minutes at a time for a total of 2 hours in an 8-hour workday; sit for 1 hour at a time for a total of 6 hours in an eight-hour work day. [Plaintiff] cannot crawl; and can climb stairs, bend, and stoop occasionally." (Tr. 20.) The ALJ determined that Plaintiff could perform her PRW as an administrative assistant, as the work is generally performed. (Tr. 21.)

17

First, the Court notes that the United States Supreme Court has expressly approved the use

of a ME. *Richardson v. Perales*, 402 U.S. 389, 396 (1971). The nation's highest court stated:

> We see nothing 'reprehensible' in this practice, as the claimant would describe it. The trial examiner is a layman; the medical adviser is a board-certified specialist. He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman examiner. He is a neutral adviser.

*Richardson*, 402 U.S. at 408. "[A]lthough the opinion of an examining physician is generally

entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the

opinion of any physician when the evidence supports a contrary conclusion." *Bradley v. Bowen*, 809

F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker,* 660 F.2d 1078, 1084 (Former 5th

Cir. Unit B 1981)) (rejecting the conclusory statement of treating physician in favor of reviewing

physician). Absolutely nothing in the record supports Plaintiff's argument that the ME was

"apparently called simply to manufacture contrary opinion evidence." (Pl.'s Br. at 4.)

"Residual functional capacity" refers to the claimant's ability to do work despite any

physical or mental impairments. 20 C.F.R. § 404.1545(a). The ALJ has the responsibility to

determine the Plaintiff's residual functional capacity at the administrative hearing based on all of

the evidence, including the medical records, observations of treating physicians, observations of

others, and Plaintiff's own description of her limitations. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th

Cir. 1995). The ALJ must resolve conflicts in the evidence and make credibility determinations

based on substantial evidence. *Lovelace v. Bowen*, 813 F.2d 55, 59-60 (5th Cir. 1987); *Allen v.

Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981) (per curiam). "The [proper] inquiry [] is whether the

record, read as a whole, yields such evidence as would allow a reasonable mind to accept the

conclusions reached by the ALJ." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). "An ALJ's

decision is not subject to reversal, even if there is substantial evidence in the record that would have

supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). *See also Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision."). "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002) (quoting *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000)).

An ALJ will grant the medical opinion of a treating physician "controlling weight" if it is "well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); S.S.R. 96-2p. In this case, the ALJ expressly declined to give "controlling weight" to Dr. Cassella's statement that Plaintiff was "disabled." The ALJ correctly noted that the question of "disability" is a matter reserved for the Commissioner to determine. *See* SSR 96-5p. The record does not show that Dr. Cassella was familiar with the definition of "disability" in the field of Social Security jurisprudence and his use of the term "disabled" probably carries with it a different connotation from that in the Act. A physician sometimes uses the term "disabled" as it is used in state workers' compensation formats. *See Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984). Physicians generally define "disability" in a manner distinct from the Act; therefore, an ALJ may reject the physician's determination of disability as determinative on the ultimate issue. *Tamez v. Sullivan*, 888 F.2d 334, 336, n.1 (5th Cir. 1989); *Milam v. Bowen*, 782 F.2d 1284, 1287-88 (5th Cir. 1986); *Barajas v. Heckler*, 738 F.2d 641, 645 (5th Cir. 1984).

Dr. Cassella's opinions reflect that they were obtained for purposes of a worker's compensation claim and to obtain welfare benefits. The ALJ did not err in failing to give controlling

weight to Dr. Cassella's opinions on the ultimate issue of disability.  Plaintiff simply disagrees with

the ALJ's assessment.  However, this does not mean that the ALJ conducted an improper analysis.

The ALJ considered Plaintiff's examinations and treatment by Dr. Ellenbogen, Dr. Yeh,, Dr.

Cassella, Dr. Tucker, Dr. Peloza, and Dr. Hite.  He considered the non-examining neurologist's

report and that of the consultative physician. The ALJ rejected Dr. Cassella's determination that

Plaintiff was disabled from all work and gave credible explanations for doing so.   The ALJ found

that Plaintiff's treating physicians recommended various exercises for Plaintiff and prescribed

medications for her.  He found that her medications provided some relief for her pain and that she

exaggerated her subjective complaints.   Thus, the Court finds that the ALJ did not fail to give

appropriate credit to the opinion expressed by Dr. Cassella or the other treating physicians, and he

did not place improper reliance upon the testimony of the ME.  The ALJ's assessment of Plaintiff's

RFC is supported by substantial evidence.

Next, the Court turns to Plaintiff's argument that the ALJ incorrectly assessed Plaintiff's

credibility.  Although an ALJ must consider subjective evidence of pain, he has the discretion to

determine the pain's disabling nature.  *Wren,* 925 F.2d at129.  He may discount a claimant's

subjective complaints if there are inconsistencies between the alleged impairments and the evidence

as a whole.  *Vaughan*, 58 F.3d at 131.   An ALJ's determination in this regard is entitled to

considerable deference. *James v. Bowen,* 793 F.2d 702, 706 (5th Cir.1986).  To be disabling, pain

must be "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Haywood v.*

*Sullivan,* 888 F.2d 1463, 1470 (5th Cir. 1989).  Conditions which are reasonably controllable with

medication are not disabling. *See Fraga,* 810 F.2d at 1305 n.11 (finding that the claimant's

hypertension was not disabling because it was controllable with medication); *see also Jenkins v.*

*Chater*, 76 F.3d 231, 232 (8th Cir. 1996) (finding that the claimant's complaints were properly discredited based in part on the her admission that the pain medication provided "some relief"). Additionally, an ALJ may properly consider a claimant's activities of daily living in assessing her credibility. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leggett*, 67 F.3d at 565 n.12 (finding that a claimant's activities may properly be considered when deciding a claimant's disability status).

Plaintiff alleges the ALJ's only assessment of her credibility is the following statement:

While the undersigned has no doubt that the claimant's impairments impose
functional limitations, the undersigned concludes that her subjective complaints are exaggerated and not

(Tr. 19-20.) The Court disagrees. Plaintiff takes this statement out of context. The ALJ properly considered all of the factors mentioned above, such as consistency of her complaints with the objective medical evidence, whether medications and other treatments provided some relief for pain, and Plaintiff's daily activities. (Tr. 19-20.)

The ALJ found Plaintiff's testimony to be inconsistent with the objective medical findings. (Tr. 19.) For example, the ALJ specifically noted that Dr. Peloza reported that an MRI of Plaintiff's back looked "pretty good" and indicated only some "subtle" early degeneration consistent with Plaintiff's age. (Tr. 19, 167.) The ALJ noted that a doctor had determined that Plaintiff could return to work without any restrictions as of March 2001. (Tr. 19, 183.) The ALJ noted that Dr. Harney had concluded, after reviewing the medical records, that Plaintiff "had no objective evidence on musculoskeletal or clinical exam, or any type of other objective tests to suggest a reasonable pain generator." (Tr. 19, 182.)

The ALJ also discounted Plaintiff's complaints of pain based on the conservative nature of the treatment prescribed for Plaintiff's pain. (Tr. 19.) The ALJ noted that Dr. Cassella recommended only exercises and over-the-counter medications when he first evaluated Plaintiff

shortly after her back injury, although he later  prescribed stronger pain medications.  (Tr. 19, 158-159, 194-217, 219-247, 250-51, 297-312.)  The ALJ noted that Plaintiff testified that ice and her medication helped to alleviate her pain and that the medical evidence showed that Plaintiff's medication provided some relief for her pain.  (Tr. 19.)

Plaintiff's account of her daily activities also detracted from her credibility.  (Tr. 19.)  The ALJ noted that Plaintiff testified that she was able to watch television, crotchet, drive, and grocery shop (if she leaned on the cart).  (Tr. 19, 44-45.)  He noted that Plaintiff also reported that after her medication became effective, she could care for her own personal needs.  (Tr. 19, 46.) The Court finds that substantial evidence supports the ALJ's assessment of Plaintiff's credibility.


V.      **Conclusion**

The Court finds from the record that: (1) the Commissioner fully considered all of Plaintiff's nonexertional impairments; (2) the Commissioner gave proper weight to the opinions of Plaintiff's treating physicians; and (3) the Commissioner properly evaluate Plaintiff's credibility.

**VI**.      **Recommendation**

Plaintiff failed to meet her burden to show that the Commissioner's decision is not supported by substantial evidence.  Accordingly, the District Court should affirm the Commissioner's decision.

Signed, February 20, 2007.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).